IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

MARY FRANCES MURPHY,          :
                                   :
            **Plaintiff,**        :
                                   :
      **v.**                      :       **Case No. C2-06-1020**
                                   :
**McDONALD'S CORP.,**        :       **JUDGE ALGENON L. MARBLEY**
                                   :       **Magistrate Judge Mark Abel**
            **Defendant.**     :

## OPINION & ORDER

### I. INTRODUCTION

This matter is before the Court on Defendant's Motion for Summary Judgment.  Plaintiff Mary Murphy sued McDonald's, her former employer, alleging that the company discriminated against her and terminated her on account of her sex and race.  For the reasons stated below, the Court **GRANTS** McDonald's Motion for Summary Judgment.

### II.  BACKGROUND

Murphy worked for McDonald's for over twenty years.  McDonald's bifurcates the operation of its restaurants into two parallel organizations: Field Service and McDonald's Operating Company (McOpCo).  The Field Service division oversees restaurants owned and operated by franchisees.  By comparison, McOpCo operates restaurants owned by McDonald's Corporation.  From 1997 to 2001, Murphy worked as a Field Service Consultant to a "patch" of McDonald's restaurants including the Fairgrounds and Duxbury locations, then owned and operated by franchisee Carl Ward.  Murphy performed so ably that her supervisors, Rebecca Rentzel and Bill Brash, promoted her to Senior Operations Consultant in the McOpCo division in 2002.  McDonald's assigned her to supervise the so-called "South Patch" consisting of five

struggling restaurants south of Columbus.  Murphy's touch proved decisive.  In less than a year, she brought the South Patch up to the company's financial and operational standards.  Rentzel rated her performance as "Exceptional."

In late 2002, McDonald's Vice President Shirley Rogers-Reece asked Murphy to purchase the chronically underperforming Fairgrounds and Duxbury restaurants.  Given Murphy's growing reputation as a turnaround specialist and her familiarity with these restaurants from her time as a Field Service Consultant, she was ideally suited to own and operate these franchises.  But problems soon followed.  Murphy, saddled with over $40,000 in personal debt, was financially ineligible to buy the restaurants.  As a result, McDonald's purchased them and put Murphy in charge of the reclamation project.  But she was unhappy with this arrangement.  As a franchisee, Murphy could run the Fairgrounds and Duxbury locations as she saw fit without the profit targets and stringent operational demands incumbent on restaurants under McOpCo's aegis.  But because the company owned the restaurants, Murphy would be required to meet McOpCo's benchmarks.  She was right to be wary, as this assignment proved to be a poisoned chalice.

Despite Murphy's reservations she accepted the assignment to supervise a patch of four restaurants including the troubled Fairgrounds and Duxbury locations.  A confluence of factors made her task very difficult.  She was unable to recruit competent managers.  Her employees were untrained and in many cases incompetent.  Like many McDonald's restaurants, Murphy's patch suffered from high personnel turnover, requiring her to waste precious time recruiting and training new employees.  To make matters worse, security was porous and theft was endemic.  Murphy devoted a considerable amount of time to locating missing bank deposits, which both

parties agree were probably stolen by her own employees.  The Gahanna restaurant, part of her patch, was robbed.  Rentzel suspended Murphy because she left the restaurant vulnerable to robbery by failing to change the locks after firing an assistant manager, reporting that the security cameras were functioning when they were not, and leaving an untrained manager alone in the restaurant.

Murphy's patch predictably struggled.  The Fairgrounds and Duxbury restaurants fell well short of McOpCo's financial and operational benchmarks in the first half of 2003.  So much so that Murphy rated her own performance as "Unacceptable."  This failure reflected in Murphy's biannual review in which Rentzel rated her performance as "Some Improvement Required."  But Murphy was unable to right the ship.  In her 2003-end-of-year evaluation, McOpCo determined that the quality, service, and cleanliness of the Fairgrounds and Duxbury restaurants had actually declined during Murphy's tenure.  She received another "Some Improvement Required" rating.      It is McDonald's policy that if an employee receives two consecutive "Some Improvement Required" ratings she is ineligible for a salary increase or a bonus and the company places her on a Performance Improvement Plan.  But this was not Murphy's fate.  Her supervisors, Rentzel and Brash, designated Murphy a "Significant Contributor" for compensation purposes so that she would receive a bonus and a wage-increase. Because of Murphy's reputation and the difficulty of her assignment, she also avoided the stigma of a Performance Improvement Plan.

In early 2004, Murphy asked McDonald's to reduce her patch to just the Fairgrounds and Duxbury restaurants.  She argued that if the company allowed her to concentrate exclusively on these problem locations she could turn them around.  The company acceded, even though all

other Operations Consultants in the Columbus area supervised more than four locations.

Murphy also formulated her own performance benchmarks for the struggling restaurants, some

of which were below McDonald's normal operating standards. Although the restaurants

improved, they fell short of even the modified standards. In her mid-2004 review Murphy again

received a "Some Improvement Requirement" rating.[1]

The situation deteriorated in the latter half of 2004. Murphy's patch received the lowest

scores in the region from mystery shoppers. The restaurants stagnated well below McOpCo's

standards of quality, service, and cleanliness. Profitability declined. In two monthly evaluations

in August and September 2004, Rentzel rated Murphy's performance "Unacceptable." After

Murphy's third consecutive"Some Improvement Required" rating in her biannual review and her

second consecutive "Unacceptable" rating in the more truncated monthly evaluation, Rentzel

finally placed her on a Performance Improvement Plan, corporate jargon for a last chance.

Murphy, diagnosed with major depression, took short-term disability leave.

When Murphy returned to work in February 2005, Rentzel and Brash set forth the terms

and conditions of her Performance Improvement Plan. She had sixty days to meet nine

performance goals. If she failed she would be fired. At Murphy's request, independent Field

Service personnel conducted many of the inspections during this period. Despite the new

evaluators, Murphy's restaurants again failed to meet McOpCo's standards for cleanliness, food

safety, service, quality, and profitability. She fell short in five of the nine categories of her

---

[1]Murphy asserts that she received a "Good" rating in her mid-2004 review because only such highly rated employees are permitted to take disability leave, which she did in the latter half of that year. This is not true. McDonald's policy was to permit disability leave for employees performing at a "Some Improvement Required" level. Murphy's inference is unfounded.

Performance Improvement Plan.  Murphy begged for thirty more days to meet the goals.  The company agreed.  At the end of the thirty-day period her patch still fell short in three of the nine categories.  McDonald's determined that Murphy's restaurants had consistently failed meet the company's operational and financial benchmarks and fired her.  She sued claiming that the company discriminated against her on account of her sex and race.  McDonald's moves for summary judgment.

### III.  STANDARD OF REVIEW

Summary judgment is proper if "there is no genuine issue as to any material fact [such that] the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  But "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In considering a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The movant therefore has the burden of establishing that there is no genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993).  But the non-moving party "may not rest upon its mere allegations."  Fed. R. Civ. P.56(e); *see Celotex*, 477 U.S. at 324; *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994).  The non-moving party must present "significant probative evidence" to show that there is more than "some metaphysical doubt as to the material facts."  *Moore v. Philip Morris Co.*, 8 F.3d 335, 339-40 (6th Cir. 1993).

### IV.  LAW & ANALYSIS

Murphy alleges that McDonald's discriminated against her on account of her sex and

race, which is an unlawful employment practice under Title VII of the 1964 Civil Rights Act.[2]

42 U.S.C. § 2000e-2.

## A.  SEX DISCRIMINATION

McDonald's contends that the Court does not have subject matter jurisdiction over

Murphy's sex discrimination claim because she did not include the allegation in her EEOC

charge.  The Court agrees.  A Title VII plaintiff must exhaust her administrative remedies before

filing suit by filing a charge of discrimination with the EEOC.  *Weigel v. Baptist Hosp. of E.*

*Tenn.*, 302 F.3d 367, 379 (6th Cir. 2002).  "The purpose of [this] requirement is to trigger an

investigation, which gives notice to the alleged wrongdoer of its potential liability and enables

the EEOC to initiate conciliation procedures in an attempt to avoid litigation."  *Dixon v.*

*Ashcroft*, 392 F.3d 212, 217 (6th Cir. 2004).

The exhaustion requirement, however, "is not meant to be overly rigid, nor should it

'result in the restriction of subsequent complaints based on procedural technicalities or the

failure of the charges to contain the exact wording which might be required in a judicial

pleading.' "  *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 732 (6th Cir. 2006) (quoting

*EEOC v. McCall Printing Corp.*, 633 F.2d 1232, 1235 (6th Cir. 1980)).  As such, the EEOC

charge "should be liberally construed to encompass all charges reasonably expected to grow out

of the charge of discrimination."  *Haithcock v. Frank*, 958 F.2d 671, 675 (6th Cir. 1992).

---

[2]In her complaint, Murphy also alleges that McDonald's breached its promise to sell the
Fairgrounds and Duxbury franchises if she reduced her debt.  But Murphy does not proffer any
evidence, either in her Opposition to Summary Judgment or in her accompanying affidavit, to
support this allegation.  She does not even respond to Defendant's Motion for Summary
Judgment attacking this quasi-contract claim.  Because she concedes that there is no genuine
issue of fact, the Court **GRANTS** Defendant's Motion for Summary Judgment with respect to
this claim.

An investigation of sex discrimination was not likely to grow from Murphy's EEOC charge.  First, Murphy neither mentioned sex discrimination nor checked the box marked "sex discrimination" in her EEOC charge.  *But see Dixon*, 392 F.3d at 217–18 (noting that a plaintiff's failure to check the appropriate box on an EEOC charge is not dispositive of whether she has satisfied the exhaustion requirement).  More importantly, Murphy's affidavit in support of her charge gives notice only of her race discrimination claim.  In it she states:

> I.  I am Black.  I was employed by the above named Respondent since 1987, serving most recently as a senior operations consultant.  On 6/6/05 I was terminated.
>
> II.  Becky Rentzel, white, operations manager, said I was discharged for poor performance.
>
> III.  I believe I was unlawfully discharged due to my race, Black, because . . ..

(Def. Mot. for Summ. J., Ex. 1).

Murphy's affidavit goes on to provide the basis for her allegation of race discrimination, including her contention that a similarly situated Caucasian woman received more favorable treatment despite poorer performance.  The use of a Caucasian woman as her foil is particularly salient—it implicitly refutes Murphy's allegation of disparate treatment because of her sex.  So much so that Murphy does not even address her failure to exhaust her administrative remedies with regard to her sex discrimination claim in her opposition to summary judgment.  The Court lacks subject matter jurisdiction over this claim.

## B.  RACE DISCRIMINATION

Murphy alleges that McDonald's discriminated against her on account of her race by: (1) assigning her to a patch of four underperforming restaurants; (2) denying her competent managers; (3) failing to provide adequate security for her patch; (4) manipulating her

performance evaluations; and (5) terminating her.  To survive summary judgment, a plaintiff must present either direct or circumstantial evidence of discrimination.  *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004).  Because Murphy admittedly proffers only circumstantial evidence, the familiar burden-shifting framework that the Supreme Court set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), governs her claims.

Pursuant to the *McDonnell Douglas* paradigm, a plaintiff must first establish a prima facie case of race discrimination.  *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994).  To do so, a plaintiff must proffer sufficient circumstantial evidence to "create an inference that an employment decision was based on an illegal discriminatory criterion."  *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312 (1996).  If a plaintiff establishes a prima facie case, the burden of production shifts to the defendant to articulate a non-discriminatory reason for its adverse employment action.  *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 149 (2000).  If the defendant is successful, the burden of production back to the plaintiff to show, by a preponderance of the evidence, that the defendant's professed reason was merely a pretext to mask a discriminatory animus.  *See Manzer*, 29 F.3d at 1083.

To establish a prima facie case of race discrimination, Murphy must show that: (1) she is a member of a protected group; (2) she was subjected to an adverse employment action; (3) she was otherwise qualified for the position; and (4) she was treated differently than similarly situated employees who were not members of the protected group.  *Arendale v. City of Memphis,* 519 F.3d 587, 603 (6th Cir. 2008).  This is not an onerous burden.  *White v. Baxter Healthcare Corp.*, 533 F.3d 381,  (6th Cir. 2008).  McDonald's contends that Murphy was not subject to disparate treatment.

-8-

### 1.  Assignment of Underperforming Restaurants

Murphy first argues that McDonald's discriminatorily assigned her a patch of four

underperforming restaurants.  This directly contradicts her deposition testimony:

> Q:     Let me finish by asking you this: I understand that you're saying it was unfair
> to put you in charge of supervising these four underperforming restaurants;
> is that correct?

> A:     All four underperforming, that's correct, sir, and **not** the assignment of the
> restaurants.  **I'm not taking about the assignment.  It's the way they
> started treating me after I was assigned**, okay.

(Murphy Dep. Nov. 11, 2007, 226:22-227:5) (emphasis added).  Murphy also concedes that the

company assigned Caucasian Operations Consultants to supervise underperforming restaurants,

further undermining her assertion of disparate treatment.  (Murphy Dep. Jan. 9, 2008, 788:19-

22).  Murphy was assigned to an underperforming patch because she had a reputation for turning

around underperforming restaurants, she had experience with the patch from her time as a Field

Service Consultant, and McDonald's was grooming her to purchase the Fairgrounds and

Duxbury restaurants.  According to Murphy and the record, her assignment was not

discriminatory.

### 2.  Competent Managers

Murphy alleges that McDonald's refused to provide able managers to run her patch on

account of her race.  Not so.  The record indicates that McDonald's had difficulty recruiting and

retaining qualified personnel to manage almost all of its restaurants in the Columbus area.

McDonald's requires three training courses at the famed Hamburger University as a prerequisite

for restaurant management: ServSafe, Basic Store Management, and Advanced Store

Management.  It is undisputed that many of the managers in Murphy's patch had yet to take

these courses.  But she was not alone.  McDonald's documents show that twelve managers in the Columbus area, all of whom worked under Caucasian Operations Consultants, had not even taken ServSafe, the entry level course.  One restaurant even employed a manager who had absolutely no training, let alone a course at Hamburger U.  It is simply not true that Murphy's Caucasian colleagues had the luxury of trained and competent restaurant managers.

It also appears that McDonald's tried to hire competent managers for Murphy's patch. For example, the company promoted Sylvia Hampton to manage the Duxbury restaurant. Hampton was, at the time of her promotion, one of the most highly rated assistant managers in the Columbus area.  Her supervisor consistently rated her performance as "Exceptional."[3] McDonald's replaced Hampton with Deandra Strohman who came highly recommended from the Sawmill restaurant.  In March 2004, Murphy rated Strohman's performance as "Good." Murphy also rated the performance of another recently promoted manager, Amy Ramirez, as "Satisfactory."[4]  Despite a weak labor market, these examples bolster McDonald's contention that it tried to equip Murphy's patch with talent to succeed.

Murphy makes much noise about the fact that Rentzel hired Leo Watkins as a manager for the Duxbury restaurant even though he had been fired as an assistant manager for incompetence from a McDonald's restaurant in Toledo, Ohio.  Murphy concludes that this is proof of race discrimination.  The Court disagrees.  Oddly, Murphy testified that her supervisors

---

[3]McDonald's later terminated Hampton for stealing from the Duxbury store.  But this is irrelevant.  What matters is that contrary to Murphy's assertion and despite a sparse pool of qualified applicants, McDonald's was trying to equip her patch with some of the most highly rated employees from other restaurants.

[4]Although Murphy now contends that Strohman and Ramirez were poor managers, she gave them both positive evaluations when she supervised them.

had no knowledge of Watkins's employment history.  If anything, Watkins's promotion to manager confirms McDonald's contention that there was a shortage of capable managers in the Columbus area—a problem that similarly situated Caucasian supervisors also confronted. Murphy was not subject to disparate treatment and therefore cannot make a prima facie case of race discrimination.

### 3.  Security

Murphy next alleges that McDonald's failed to provide adequate security to her patch on account of her race.  It is undisputed that Murphy's patch was vulnerable to both robbery and employee theft.  In 2004, the Gahanna restaurant was robbed, resulting in Murphy's suspension.[5] Cash awaiting deposit regularly went missing at the Duxbury and Fairgrounds restaurants, presumably stolen by McDonald's employees.  One particularly incompetent (or crooked) manager left a cash deposit in her car, where it was predictably stolen.  Theft ate up a considerable percentage of Murphy's time—so much so that she requested a Brinks truck to take deposits from her restaurants to the bank.  McDonald's initially denied this request, but later granted it.

Missing from this tale of woe is any evidence that the company treated similarly situated Operations Consultants any differently.  Just the opposite.  McDonald's produced a tome of incident reports showing that other Columbus area restaurants had grave security concerns.  As Murphy admitted in her deposition, "[a]ll McDonald's restaurants have internal theft issues."

_____

[5]Murphy asserts that McDonald's breached company protocol by suspending her after conducting an investigation rather than immediately after the robbery.  But it seems that this was to Murphy's benefit.  Rather than disciplining her with haste, Rentzel suspended her only after discovering that Murphy failed to change the locks and misrepresented that the security system was operational.

(Murphy Dep. Jan. 9, 2008, 790:13-14). Indeed, "every restaurant at McDonald's has security issues." (*Id*. 789:19-20). Further, it is standard company practice for Operations Consultants to bare disproportionate responsibility for reporting and investigating crime at their restaurants. Rather than deny Murphy the means to improve security, McDonald's granted many of her requests. In 2003, Rentzel approved new security systems for the Fairgrounds and Duxbury restaurants and the use of the Brinks truck for cash deposits. Murphy's restaurants were the only ones in the Columbus area to have use of an armored truck. There is nothing in the record to suggest disparate treatment.[6]

## 4. Performance Evaluations

Murphy further argues that Rentzel and Brash manipulated her performance evaluations. McDonald's standard method for evaluating the performance of personnel and the quality of restaurants is the Restaurant Operation Improvement Process ("ROIP"). Every restaurant is subject to at least two ROIP inspections per year, in which McDonald's management, Field Service personnel, and mystery shoppers assign scores for quality, service, cleanliness, food safety, and customer satisfaction. Operations Consultants are graded on the ROIP scores and profitability of restaurants in their patch.

Murphy admits that the three consecutive evaluations in which Rentzel rated her performance as "Some Improvement Required" were not discriminatory. She also concedes that the quality of the food and the service at her restaurants was well below McDonald's minimum

---

[6]Murphy complains that the company did not suspend the Caucasian supervisor who took over the Gahanna restaurant despite the fact that she did not fix the security system. This is not evidence of discrimination. McDonald's suspended Murphy not because she failed to fix the cameras but because she failed to change the locks after terminating an assistant manager and *falsely* reported that the camera system was in working order.

standards.  (Murphy Dep. Nov. 11, 2007, 195:2-5).  Murphy further characterized the mystery shopper score for her patch as unacceptable during her tenure.  (*Id*., 208:20-22).  Curiously, she does not even dispute that it was discriminatory to place her on a Performance Improvement Plan.  She testified, quite adamantly: "I'm telling you that none of the evaluations are discriminatory."  (Murphy Dep. Nov. 21, 2007, 361:14-15).

Murphy protests that the restaurants in her patch were in terrible condition when she took over and that inadequate personnel and security concerns prevented her from turning them around.  This is besides the point.  The fact that McDonald's did not take into account exigent circumstances is no evidence of disparate treatment.  Perhaps McDonald's was harsh and should have considered the difficulty of Murphy's assignment.  Murphy does not allege, let alone show, that the company excused the failure of any other supervisor to bring their patch up to McDonald's financial and operational benchmarks.

Rather, Murphy engages in a lengthy examination of her 2004 "scorecard" in which McDonald's deemed her performance "Unacceptable" and the performance of three Caucasian supervisors as "Needs Some Improvement."  This is apparently evidence of discrimination. First, this directly contradicts her deposition testimony in which she stated that the evaluation was not discriminatory.  Second, according to the scorecards, Murphy's patch placed last in the categories: Mystery Shop, Fast Score, Comp Sales, Guest Count, TPCH, and Crew Size. Although Murphy is correct in that many of the categories she was not far behind the other three Operations Consultants, it fails to strike the Court as discriminatory when a company gives the lowest-rated supervisor the worst performance evaluation.

Murphy further alleges that Rentzel and Brash manipulated her evaluation process by

-13-

personally inspecting her patch during her Performance Improvement Plan, which according to her, violated company policy.  Instead, she insists that supposedly unbiased Field Service personnel should have conducted the evaluations.  Not so.  McDonald's standard practice was to require an employee's direct supervisors to monitor compliance with a Performance Improvement Plan.  What's more, McDonald's, at Murphy's request, assigned Field Service inspectors to review her patch.  The evidence is that rather than discriminate against Murphy, the company altered its practices to accommodate her.

In addition, she contends that Rentzel stopped telling her when to expect mystery shoppers so that her ratings would suffer.  It is undisputed that for a period in 2004 and 2005, Rentzel told every Operations Consultant under her supervision when the mystery shoppers would arrive.  Rentzel apparently stopped this self-defeating practice at Murphy's request.  After that, according to Murphy, Rentzel concealed the mystery shoppers' schedule from each and every one of her Operations Consultants.  There was no disparate treatment and Murphy cannot make out a prima facie case of race discrimination.

Murphy's discriminatory-evaluations claim finally settles on her allegation that in 2005, Rentzel fabricated ROIP-deductions so that she would fail her Performance Improvement Plan. Rentzel allegedly docked Murphy's restaurants for leaves in the parking lot and for failing to use the proper amount or type of cleaning solution.  Again, Murphy's allegations fall short of even a prima facie case of race discrimination because there is no evidence that Rentzel failed to apply the same rigorous standard to similarly situated employees.  Furthermore, such allegations, even if true, amount to little.  Murphy failed her Performance Improvement Plan not because her restaurants were unclean, but because her patch performed poorly on mystery-shopper

-14-

evaluations, it fell short of the company's profitability target, and customers waited too long in line.[7]  Notably, none of these factors are subject to manipulation by either Rentzel or Brash. Leaves and cleaning solution are of de minimis importance compared to those metrics. Discrimination this was not.

### 5.  Termination

Finally, Murphy alleges that McDonald's fired her on account of race when it only demoted similarly situated Caucasian Operations Consultants.  She insists that McDonald's demoted but did not terminate four Caucasian supervisors, Steve McElhatten, Steve Mason, Anne Marie Hamilton, and Dan Aloi, all of whom allegedly underperformed.  In fact, none of these employees was similarly situated.

McElhatten performed so ably that McDonald's promoted him.  Mason outscored Murphy in nine of twelve categories in the 2004-end-of-year scorecard.  Hamilton was not a full-time employee at the time McDonald's offered her a demotion.  Unlike Murphy, upon returning from disability leave she was working just four hours per day.  Neither Hamilton nor Aloi were Senior Operations Consultants, neither received comparably poor reviews, and neither failed a Performance Improvement Plan.  The quartet were not similarly situated to Murphy.  *See Mickey v. Zeidler Tool & Die Co*., 516 F.3d 516, 522 (6th Cir. 2008) (noting that a plaintiff alleging employment discrimination must show the disparate treatment of non-protected employees who are "similarly situated . . . in all relevant respects") (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 353 (6th Cir. 1998)).

---

[7]The Court presumes that "TTL/KVS times" is jargon for the average time between orders at the drive-through window and at the counter, which the company uses as a proxy for staff efficiency.

Even assuming, arguendo, that Murphy could show a prima facie case of race discrimination, she would not survive summary judgment.  In that case the burden of production would shift to McDonald's to articulate a legitimate, non-discriminatory reason for Plaintiff's termination.  *See McDonnell Douglas*, 411 U.S. at 795.  The company easily clears this hurdle. It is undisputed that Murphy's restaurants consistently failed meet the company's operational and financial standards.  She received three consecutive "Some Improvement Required" ratings, evaluations she admits were not discriminatory.  Even though McDonald's customary practice is to put an employee on a Performance Improvement Plan after two such ratings, Rentzel only put Murphy on the program after three.  Her performance evaluations in the fall of 2004 dropped as far as "Unacceptable."

At the outset, Rentzel and Brash made it clear that if Murphy failed to pass her Performance Improvement Plan she would be fired.  Fail she did.  At her request, independent Field Service personnel conducted the bulk of the inspections.  Nevertheless, her patch failed in five of nine categories.  When Murphy begged for an extra thirty days, McDonald's agreed.  But her restaurants never met McDonald's benchmarks for profitability, mystery-shopper ratings, and wait-time.  Put simply, Murphy did not perform.  Her restaurants were consistently unprofitable, unclean, unsafe, and unappetizing.  So McDonald's fired her.  This legitimate, non-discriminatory justification is more than sufficient to satisfy the second prong of the *McDonnell Douglas* paradigm.

The burden of production shifts back to Murphy to prove, by a preponderance of the evidence, that McDonald's professed reason was merely a pretext to mask a discriminatory animus.  *See Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 550 (6th Cir. 2004).

-16-

Murphy may establish pretext by showing that McDonald's professed reason: (1) has no basis in fact; (2) did not actually motivate her termination; or (3) was insufficient to warrant her termination.  *Manzer*, 29 F.3d at 1084.  Murphy contends that her poor performance did not actually motivate her termination.  Rather, she proffers an intricate conspiracy theory.

According to Murphy, from early 2002, McDonald's executed an elaborate ruse to set her up for failure and then terminate her.  She contends that the company never intended to sell her the Fairgrounds or Duxbury franchises.  Murphy alleges that it was all a hoax designed solely to lure her into accepting the assignment of the patch composed of four underperforming restaurants.  Murphy insists that Brash and Rentzel refused to hire competent managers or provide adequate security in the hopes that the restaurants would so deteriorate in quality, service, and profitability, that they could safely fire her.

This narrative is deeply flawed and self-evidently far-fetched.  McDonald's spent significant time and money retaining an accountant to examine her finances and an attorney to set up a corporation for her to purchase the Fairgrounds and Duxbury restaurants.  This considerable investment indicates that the company intended to sell the franchises to Murphy only for her personal debt to sink the deal.  Moreover, Rentzel and Brash would have no incentive to run down restaurants that were also under their management.  After all, the plight of Fairgrounds and Duxbury locations would reflect equally poorly on them to their supervisors as it did on Murphy.

Further, the alleged masterminds of the plot, Rentzel and Brash, were the same duo who repeatedly promoted Murphy throughout her career, rated her performance as "Excellent" when she supervised the South Patch in 2002, designated her a "Significant Contributor" so that she

-17-

would get a bonus and pay raise to which she was not entitled, breached company protocol by waiting until she received a third consecutive "Some Improvement Needed" rating before placing her on a Performance Improvement Plan, and gave her an extra thirty days for one last chance to meet the company's performance benchmarks. *See Buhrmaster v. Overnite Transp. Co.*, 61 F.3d 461, 464 (6th Cir. 1995) (applying the so called "same actor inference," whereby the appellate court presumed that an individual who is willing to hire and promote a person of certain class is unlikely to fire them simply because they are member of that class).

By contrast, Murphy offers nothing to support her allegation that McDonald's conspired to sabotage her patch so that the company could fire her with impunity.  This contention is belied by the evidence and is not the least credible.  Under the second *Manzer* criteria, Murphy must show "that the sheer weight of circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup."  *Manzer*, 29 F.3d at 1084. But the evidence indicates that McDonald's fired Murphy because she failed to turn around struggling restaurants and not on account of her race.  Murphy fails to undermine the legitimate non-discriminatory reason given for her termination: she did not deliver.  Unfair—perhaps. Discrimination—certainly not.

### C.  HOSTILE WORK ENVIRONMENT

Murphy also alleges that she was subject to a hostile work environment on account of her race.  In order to establish a hostile-work-environment claim, a plaintiff must demonstrate that: (1) she is a member of a protected class; (2) she was subject to unwelcomed harassment; (3) the harassment was based on her race; (4) the harassment created a hostile work environment; and (5) the employer failed to take reasonable care to prevent and correct any harassing behavior.

*Russell v. Univ. of Toledo*, __ F.3d__ , 2008 WL 3288345 at *8 (6th Cir. 2008).  McDonald's contends that Murphy was not subject to unlawful harassment.  The Court agrees.

Actionable harassment "arises where the workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Michael v. Caterpillar Fin. Serv. Corp.,* 496 F.3d 584, 600 (6th Cir. 2007) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  But a "hostile-work-environment claim is cognizable only if the purported harassment . . . occurred because of the employee's protected status."  *Id*.  Most of Murphy's allegations of a hostile work environment are nothing more than a recitation of her claims of disparate treatment, which the Court has found to be baseless.

With two exceptions, Murphy's claims are devoid of any derogatory statement suggesting that Murphy was subject to harassment on account of her race.  At a meeting with Rentzel and African-American Human Resources representative Joyce Aikens-Jackson, fellow supervisor Debbie Cameally told Murphy that McDonald's could not recruit competent managers for the Fairgrounds or Duxbury restaurants because it was "too dark" there.  This remark is certainly offensive.  But McDonald's responded appropriately.  Aikens-Jackson immediately reprimanded Cameally: "I find that remark offensive; don't say it."  (Aikens-Jackson Aff. at 63).  Rentzel also chastised her.  A stray comment from a peer without supervisory or decision-making authority does not constitute a hostile work environment, especially considering that the company acted swiftly to condemn the culpable employee.  *See Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000) (holding that isolated incidents, "unless extremely serious, will not amount to discriminatory changes in the terms or

conditions of employment").

Murphy also asserts that employees at the Fairgrounds restaurant became upset because someone in management allegedly referred to them as "your people." Murphy provides no context for this statement leaving the Court to speculate whether it was innocuous or offensive. Despite this ambiguity, McDonald's immediately dispatched Aikens-Jackson to reiterate to the Fairgrounds employees that the company would not tolerate remarks that could be interpreted as discriminatory. Again, isolated comments met with decisive corporate condemnation are not sufficient to support an allegation of a hostile work environment. *See Caterpillar,* 496 F.3d at 600 (noting that to a constitute a hostile environment the workplace must be "permeated with discriminatory insults"). This claim is dismissed.

### D. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

To prevail on a claim for intentional infliction of emotional distress, a plaintiff must show that: (1) defendant intended to cause emotional distress, or knew or should have known that actions taken would result in serious emotional distress; (2) defendant's conduct was extreme and outrageous; (3) defendant's actions proximately caused plaintiff's psychic injury; and (4) plaintiff suffered serious mental anguish. *Hanly v. Riverside Methodist Hosp.*, 603 N.E.2d 1126, 1132 (Ohio 1991). For Murphy to prevail, McDonald's conduct must be "so extreme and outrageous that it went beyond all bounds of decency and was such as to be considered utterly intolerable in a civilized community." *Callaway v. Nu-Cor Auto. Corp.*, 849 N.E.2d 62, 64 (Ohio Ct. App. 2006). Obviously, this claim is baseless.

## V.  CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant's Motion for Summary

Judgment with respect to all of Plaintiff's claims.  This case is **DISMISSED**.

**IT IS SO ORDERED.**


                                  __s/Algenon L. Marbley_____
                                  **ALGENON L. MARBLEY**
                                  **UNITED STATES DISTRICT JUDGE**

**DATED: September 17, 2008**